UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA QUAMINA, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>JUSTANSWER LLC,<br><br>    Defendant. | Case No. 22-cv-06051-JD<br><br>**SECOND ORDER RE ARBITRATION** |

In this putative class action, named plaintiffs Jessica Quamina, Tasha Davis, Kristie Nelson, Kseniya Godun, Moya McDowell, Renee Pettit, and Latoya Foust, allege that they were enrolled without their consent in recurring paid subscriptions for the online question-and-answer service operated by defendant JustAnswer, LLC. Dkt. No. 1. JustAnswer asks to send the case to arbitration pursuant to the Federal Arbitration Act (FAA) and an arbitration clause in its Terms of Service (TOS). Dkt. No. 26. The background of this litigation was explained in a prior order that called for supplemental briefing. *See* Dkt. No. 36. The parties submitted supplemental statements addressing choice of law and whether a trial is required on the question of contract formation. *See* Dkt. No. 37. A trial on contract formation is not required, and the record indicates that only plaintiff Pettit is subject to a binding arbitration agreement.

## BACKGROUND

The parties' main dispute is whether JustAnswer provided legally sufficient notice of the arbitration agreement, which is contained in the TOS. The answer turns on JustAnswer's sign-up process and communications as they relate to the TOS.

### I. DISCLOSURE OF TERMS

JustAnswer's Vice President of Product Strategy & Growth, Pranav Nayak, averred in a declaration that the company's user records allowed him "to reconstruct exactly which JustAnswer

1    webpages" plaintiffs saw when they signed up for the service.  Dkt. No. 27 ¶¶ 11, 13.  Plaintiffs do
2    not dispute the contents of these web pages.

3         **A.  Landing Page**

4    Nayak states that plaintiffs would have started by submitting a question on a landing page.
5    Dkt. No. 27 ¶¶ 14, 21.

6    When Kseniya Godun and Jessica Quamina signed up, they submitted their questions on
7    the mobile phone landing page:



22   *Id*. ¶¶ 15-16 & Exh. 4.  As the white text below the "Start chat" button stated: "By chatting and
23   providing personal info, you understand and agree to our Terms of Service and Privacy Policy."
24   *Id*.  The words "Terms of Service" were underscored in an apparent hyperlink.

25   JustAnswer did not submit the landing pages that the other plaintiffs would have seen.

26        **B.  Payments Page**

27   After submitting their questions, the plaintiffs were redirected to a payments page.  Dkt.
28   No. 27 ¶ 21.  The format of the payments page varied over time.

1          When Tasha Davis, Kristie Nelson, and Jessica Quamina signed up, the payments page
2   looked like this:

 

16   Dkt. No. 27 ¶ 34 & Exh. 11 (Davis); Dkt. No. 27 ¶¶ 32, 36 & Exh. 10 (Nelson and Quamina).  The
17   payments pages disclosed the Terms of Service via hyperlink in small font underneath a separate
18   proviso about automatic membership renewal.  The TOS disclosure advised that clicking "Start
19   my trial" would indicate agreement to the terms.
20          When Kseniya Godun, Latoya Foust, and Moya McDowell signed up, the button read
21   "Connect now" instead of "Start my trial," and the text of the TOS disclosure read: "I agree to the
22   Terms of Service…."  The TOS were hyperlinked, although the words were set in black type and
23   not in color.  There were also "box[es] with a blue check mark" next to the TOS disclosure.  *Id.*
24   ¶ 24.  However, the box was already checked, meaning the plaintiffs were not required to check
25   the box themselves before proceeding.  *See id*. ("Below those fields was a box with a blue check
26   mark informing [Godun] that she agrees to the Terms of Service[.]"); Dkt. No. 1 ¶ 38.  It is not
27   clear whether this box may be unchecked.
28

3

1   The TOS disclosures on the payments pages they saw looked like this:



10  Dkt. No. 27 ¶¶ 24-27 & Exhs. 6-7; *id*. ¶¶ 28-29 & Exh. 8.

11  When Renee Pettit signed up, the payments page looked like this:

21  Dkt. No. 27 ¶¶ 30-31 & Exh. 9.  The checkbox and blue checkmark had disappeared.  The text advised that, "By clicking 'Confirm now,' I agree to the <u>Terms of Service</u>…."  The words "Terms of Service" were underlined and set in blue type, indicating a hyperlink.

### C.  Welcome Email

After submitting their questions and paying for their memberships, the plaintiffs would have also received a "welcome" email stating: "This membership renews automatically and the membership fee will be charged each month until you cancel.  Cancel anytime.  Learn more."  *Id*. ¶¶ 41-42; *see id*., Exh. 12.  The words "Learn more" hyperlinked to the TOS.  Dkt. No. 27 ¶ 42.

### D. Text Messages

Plaintiffs Godun, Pettit, Foust, and Quamina also received a "welcome" text stating: "Welcome to JustAnswer!  The Expert will text you here with a response.  Text HELP for help and STOP to end.  See terms of service: www.justanswer.com/info/terms-of-service?r=sms."  *Id.* ¶¶ 44-45.  Plaintiff McDowell received a nearly identical text message.  *Id.* ¶ 46.

### E. Chat Interface

JustAnswer also submitted a screenshot of the chat interface.  *Id*. ¶¶ 47-51 & Exh. 13.  The chat interface looks like this:



The text below the "Send" button states: "Your conversation is covered by our Disclaimer."  *Id*., Exh. 13.  The word "Disclaimer" was blue, and linked to a page that, in turn, linked to the TOS.  *Id*. ¶ 51.

## II.  PLAINTIFFS' EVIDENCE

Plaintiffs filed declarations in opposition to arbitration stating: "I have never checked a box or signed my name on JustAnswer LLC's Terms of Use or any other document indicating that the purchase of Defendant's services would automatically enroll me in reoccurring, monthly charges."  Dkt. Nos. 31-1 ¶ 7, 31-2 ¶ 8, 31-3 ¶ 8, 31-4 ¶ 9, 31-5 ¶ 8; 32 ¶ 9; 33 ¶ 9.  Most also say: "When I registered for an account and used Defendant's services, I did not view nor receive a copy of JustAnswer LLC's Terms of Use."  Dkt. Nos. 31-1 ¶ 2; 31-3 ¶ 2; 31-4 ¶ 3; 31-5 ¶ 2; 32 ¶ 3; 33 ¶ 3.

**III. ARBITRATION CLAUSE**

For the TOS, JustAnswer provided three versions dating from 2018 to the present.[1] The relevant provisions are materially the same. All contain an arbitration provision governed by the FAA that delegates issues of arbitrability to the arbitrator. Dkt. Nos. 27-1 ¶ 18(b); 27-2 ¶ 21(c); 27-3 ¶ 21(c). Each version of the TOS also contains a class action waiver. Dkt. Nos. 27-1 ¶ 18(d); 27-2 ¶ 21(d); 27-3 ¶ 21(d).

**IV. PRIOR LITIGATION**

In 2020, JustAnswer was sued in a nearly identical lawsuit challenging the automatic enrollment of users in memberships. *See* Dkt. No. 1 ¶¶ 8-28. When it appealed the denial of a motion to send that case to arbitration, the California Court of Appeal held that the JustAnswer payments page at that time did not provide legally sufficient notice of the TOS. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021). The TOS disclosure looked like this:



Plaintiff Jessica Quamina was a participant in that lawsuit and has already released her claims against JustAnswer. Dkt. No. 37 at 20. Plaintiffs acknowledge as much and have agreed to withdraw Quamina as a plaintiff. *Id.*

---

[1] Plaintiffs' evidentiary objections to the TOS on authentication and foundation grounds, *see* Dkt. No. 31 at 14, are misguided. *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045 (9th Cir. 2009). Plaintiffs also do not provide any reason to doubt their authenticity.

**LEGAL STANDARDS**

The Court has detailed the standards governing a motion to compel arbitration under the FAA in several prior orders, which are incorporated here. *See Keller v. Chegg, Inc.*, No. 22-cv-06986-JD, 2023 WL 5279649, at *1 (N.D. Cal. Aug. 15, 2023); *Williams v. Eaze Sols., Inc.*, 417 F. Supp. 3d 1233 (N.D. Cal. 2019). In pertinent part, the Court's role under Section 4 of the FAA "'is limited to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue.'" *Cornet v. Twitter, Inc.*, No. 22-cv-06857-JD, 2023 WL 187498, at *1 (N.D. Cal. Jan. 13, 2023) (quoting *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004)). "If the party seeking to compel arbitration establishes both factors," the Court "'must order the parties to proceed to arbitration only in accordance with the terms of their agreement.'" *Id.* (quoting *Lifescan*, 363 F.3d at 1012).

The validity and scope of an agreement to arbitrate are determined by the Court unless the parties clearly provide that those questions will be determined by the arbitrator. *Id.* at *2 (citing *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)). "A delegation clause is enforceable when it manifests a clear and unmistakable agreement to arbitrate arbitrability, and is not invalid as a matter of contract law." *Id.* (*citing Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015)). "Challenges to the validity of a delegation clause may be directed to (1) 'the validity of the delegation clause itself,' or (2) 'the validity of the agreement to arbitrate or to the contract as a whole.'" *Id.* (quoting *McLellan v. Fitbit, Inc.*, No. 16-cv-00036-JD, 2017 WL 4551484, at *1 (N.D. Cal. Oct. 11, 2017)). The Court determines "any validity challenges directly addressed to delegation." *Alonso v. AuPairCare, Inc.*, No. 18-cv-00970-JD, 2018 WL 4027834, at *1 (N.D. Cal. Aug. 23, 2018) (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)). Any challenge to the overall agreement to arbitrate is for the arbitrator. *Id.* (citing *McLellan*, 2017 WL 4551484, at *1).

**DISCUSSION**

**I. CONTRACT FORMATION**

The first question is whether the parties formed an agreement to arbitrate. *See Norcia v. Samsung Telecomms. America, LLC*, No. 14-cv-00582-JD, 2014 WL 4652332, at *4 (N.D. Cal. Sept. 18, 2014), *aff'd*, 845 F.3d 1279 (9th Cir. 2017). The Court will order arbitration without a trial only if there is no dispute of material fact as to contract formation. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670, 672 (9th Cir. 2021). When "the existence of an arbitration agreement is at issue," "the presumption in favor of arbitrability does not apply." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). The party seeking arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal citation and quotation marks omitted).

Contracts formed on the Internet fall on a spectrum. At one end are "'clickwrap' agreements, in which a website presents users with specified contractual terms" and "users must check a box explicitly stating 'I agree' in order to proceed." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (internal citation and quotation omitted). These agreements are generally valid because "the user must affirmatively acknowledge receipt of the terms of the contract." *McLellan v. Fitbit, Inc.*, No. 16-cv-00036-JD, 2018 WL 1913832, at *2 (N.D. Cal. Jan. 24, 2018) (citing cases).

"At the other end of the spectrum" from clickwrap agreements "are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Oberstein*, 60 F.4th at 513 (internal citation and quotation omitted). Courts are reluctant to find mutual assent under these circumstances, because browsewrap agreements "often leave users unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.* (internal citation and quotation omitted).

In between are so called "sign-in-wrap" agreements that "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or

8

she is agreeing to the terms of service when registering or signing up." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017) (citation omitted). For agreements that fall between a clickwrap and a browsewrap agreement, "courts analyze mutual assent under an objective-reasonableness standard." *Oberstein*, 60 F.4th at 513 (citation omitted). A valid internet contract is formed if the user received "reasonably conspicuous notice" of the agreement and exhibited "an unambiguous manifestation of assent." *Id.* at 514.

State contract law governs the contract formation question. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). In this case, the parties agree that California law applies, because there is no conflict between the laws of the relevant states on the issue of Internet contract formation. *See* Dkt. No. 37 at 1 & 10. The Court's independent assessment is that the law governing formation of Internet contracts in New York[2], North Carolina[3], and Florida[4] is materially identical to California's, and so the Court applies familiar contract formation principles under California law. *See McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87 (2010).

The application of these principles to the facts here is straightforward. There is no fact dispute about what the plaintiffs saw when they signed up for JustAnswer. Plaintiffs did not address any evidentiary objections to the screenshots of the sign-up pages attached to the Nayak declaration, and their assertions that they "did not view nor receive a copy of JustAnswer LLC's Terms of Use," *e.g.*, Dkt. No. 31-1 ¶ 2, do not create a relevant fact dispute that might warrant a trial. *See Keller*, 2023 WL 5279649, at *3.

---

[2] *See Berman*, 30 F.4th at 855.

[3] In North Carolina, "online consumer agreements are valid and enforceable when a user affirmatively acknowledges and agrees to contractual terms by checking a box or clicking a button as a condition of proceeding with his transaction." *Moreno v. Expedia*, No. 18-cv-105, 2018 WL 3059617, at *3 (W.D.N.C. June 20, 2018) (citation omitted). *See Bergenstock v. LegalZoom.com*, 2015 WL 3866703, at *5 (N.C. Super. Ct. June 23, 2015) (similar) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)).

[4] Florida uses a similar framework to ours for evaluating Internet contracts. *See*, *e.g.*, *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484-85 (Fla. Dist. Ct. App. 2022) (finding a click-wrap agreement valid); *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. Dist. Ct. App. 2017) (finding that "browsewrap" agreement was not sufficiently "conspicuous").

Plaintiffs object to the copies of the TOS attached to the Nayak declaration on the ground that they are the equivalent of an unsigned form contract, *see* Dkt. No. 31 at 11, but this misunderstands the issue. JustAnswer does not need to submit a "written document signed by Plaintiffs" or "an electronic record showing that [they] agreed to an arbitration clause online." Dkt. No. 31 at 10. As discussed, users of online services generally manifest assent to a website's TOS by clicking a button on a separate webpage that discloses the TOS via a pop-up window or hyperlink -- not by signing the TOS. The pertinent question is whether JustAnswer has established that that happened here.[5]

As to the pertinent legal question, JustAnswer contends that plaintiffs accepted "sign-in wrap" arbitration agreements that necessarily pass muster under our precedents. Dkt. No. 26 at 6. Plaintiffs respond that "the sign-in 'browsewrap' agreement did not provide constructive notice" of the TOS, and then proceed to canvass district court decisions from mostly irrelevant jurisdictions addressing "browsewrap" agreements. Dkt. No. 31 at 7-9. This was an unhelpful discussion, but the legal analysis for each of the communications at issue is straightforward.

### A. Landing Page

Plaintiff Kseniya Godun did not receive legally sufficient notice of the TOS on the landing page.

Our circuit's decision in *Berman*, following *Sellers*, 73 Cal. App. 5th 444, clarified the standard for inquiry notice of a website's TOS. "Website users are entitled to assume that important provisions -- such as those that disclose the existence of proposed contractual terms -- will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. Specifically,

---

[5] Plaintiffs also object that Nayak's testimony regarding their sign-up dates violates the best evidence rule and is inadmissible hearsay because it is based on computer records that were not attached to the declaration itself. *See* Dkt. No. 31 at 12. The best evidence rule has no application because the declaration does not reproduce the contents of the unproduced records. And plaintiffs themselves identify the hearsay exception that would allow the testimony to come in at trial -- "Fed. R. Evid. 803(6)," *id*. -- so it may be considered. *See Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). At any rate, plaintiffs confirmed the month of their enrollments in their declarations, which are not hearsay.

1  "the fact that a hyperlink is present must be readily apparent," and a text notice that lacks the
2  "[c]ustomary design elements" of a hyperlink will not suffice. *Id*. "A web designer must do more
3  than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from
4  the surrounding text." *Id*. (internal quotation omitted); *see also Patrick v. Running Warehouse,*
5  *Inc, LLC*, ___ F.4th ___, No. 22-cv-56078, 2024 WL 542831, at *16 (9th Cir. Feb. 12, 2024)
6  (noting with approval that "the hyperlinked phrase 'terms of use' is colored bright green," and "the
7  same color as other clickable links on the page, suggesting clearly that it is a hyperlink").

8  As the preceding screenshots demonstrate, the text notice on the JustAnswer landing page
9  "is the antithesis of conspicuous." *Berman*, 30 F.4th at 856. It appears in the smallest print
10 anywhere on a cluttered page and relies entirely on "underscore" to provide notice of the
11 hyperlink. *Id*. at 857. Consequently, this notice will not support the formation of an agreement to
12 arbitrate.

### B. Payments Page

14 Plaintiffs Tasha Davis and Kristie Nelson did not agree to arbitrate on the payments page.
15 The pages they saw are either identical to, or legally indistinguishable from, the version of the
16 payments page that the California Court of Appeal squarely rejected in *Sellers*, 73 Cal. App. 5th
17 444. The text notice is again insufficient because it is barely legible, and the hyperlinks are not set
18 in contrasting type. *See Berman*, 30 F.4th at 857.

19 Plaintiffs Kseniya Godun, Moya McDowell, and Latoya Foust did not agree to arbitrate on
20 this page either. To start, the terms were, once more, not reasonably conspicuous because the
21 hyperlinked terms were only underlined and not otherwise sufficiently set apart from the rest of
22 the text notice. *Id*. These plaintiffs also did not "take some action … from which assent might be
23 inferred." *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal.
24 2016) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176-77 (9th Cir. 2014)). They
25 were not required to check the box next to the TOS, because it was already checked for them. The
26 button they did click simply says "Connect now" -- not "I agree" or any other phrase that even
27 gestures at a binding agreement.

1      JustAnswer's case citations (Dkt. No. 26 at 10) are inapposite, because in each of those

2 cases the website warned users that clicking a button would be deemed acceptance of a contract.[6]

3 Here, the text notice does not warn the user that by clicking "Connect now," she agrees to binding

4 terms.  That difference is meaningful.  "'A user's click of a button can be construed as an

5 unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking

6 will constitute assent to the terms and conditions of an agreement.'"  *Oberstein*, 60 F.4th at 515

7 (quoting *Berman*, 30 F.4th at 857).  Because the text notice did not "explicitly notify [plaintiffs] of

8 the legal significance of the action," plaintiffs' assent cannot be inferred.  *Berman*, 30 F.4th at 858.

9      The result for plaintiff Renee Pettit is different.  In her circumstances, the TOS link was

10 directly above the sign-up button, underlined, and set in "bright blue font."  *Oberstein*, 60 F.4th at

11 516.  The text above the sign-up button expressly warned that by clicking "Confirm now," Pettit

12 would agree to the TOS, and by doing so, she unambiguously manifested her assent.  *See id.* at

13 517.

14      **C.  Welcome Email**

15      JustAnswer tries to falls back on the communications sent after the fact, but the welcome

16 email is not a contract formation point.  The email was not "temporally coupled" with the act of

17 joining JustAnswer -- "i.e., the consumer was [not] notified of the terms at the time of sale."

18 *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 294, 292 (2d. Cir. 2019) (citing *Meyer*, 868 F.3d at 78

19 (applying California law)).  Put more plainly, the elements of contract formation are offer and

20 acceptance, not acceptance followed by offer.

21      To be sure, the email might have advised users that a continued use of the service after

22 receipt of the email would bind them to the TOS.  *See*, *e.g.*, *In re Facebook*, 185 F. Supp. 3d at

23 1164, 1167 (users had notice of terms updates where "email was entitled, 'We're updating our

24 terms and policies and introducing Privacy Basics,' and the email contained hyperlinks to the new

---

[6] *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (website warned users that "signing up constituted agreement to the Terms of Service"); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d. Cir. 2017) (similar); *Patrick v. Running Warehouse, LLC*, No. 21-cv-09978-ODW, 2022 WL 10584136, at *6 (C.D. Cal. Oct. 18, 2022), *aff'd*, 2024 WL 542831 (similar); *Silver v. Stripe Inc.*, No. 20-cv-08196-YGR, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (similar).

12

1  Terms of Use"). But the email provides no such notice. The email is about membership renewal.
2  A reasonably prudent user would believe that clicking "Learn more" would pull up information
3  about how to cancel her membership -- not about purportedly binding terms of service. *See*
4  *Motley v. ContextLogic, Inc.*, No. 18-cv-02117-JD, 2018 WL 5906079, at *2 (N.D. Cal. Nov. 9,
5  2018) (declining to find mutual assent where hyperlinked word "'here' [was] used in connection
6  with the 'more details' language that is most readily understood as referring to possible message
7  and data charges for users opting to get text communications, and not to the terms of service.").

### D. Text Messages

JustAnswer also points to text messages sent to some plaintiffs after they signed up as evidence of assent. That will not do. Assuming plaintiffs received the text messages, they were not required to open them to use the service, and a reasonable user would think herself free to delete them. "'[A]n offeree … is not bound by inconspicuous contractual provisions of which [s]he was unaware, contained in a document whose contractual nature is not obvious.'" *Norcia*, 845 F.3d at 1285 (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Ct. App. 1972)). In this case, the contractual nature of the text messages was especially non-obvious, because JustAnswer sent the messages after the plaintiffs had already exchanged multiple messages with their assigned experts. *See* Dkt. No. 27 ¶¶ 45-46 (timestamps of text messages) and ¶¶ 53-56 (times of chats with experts).[7] A "reasonably prudent user" would not expect to be sent, over text message, a contract governing an internet transaction that in her mind has already occurred. *Sellers*, 73 Cal. App. 5th at 482-83 (internal citation and quotation omitted) (rejecting notice of TOS displayed when user seeks to "retrieve the answer they have already paid for").

### E. Chat Interface

The chat interface also fails to provide conspicuous notice of the TOS. The "Disclaimer" referenced below the chat button links to a Disclaimer page, which then links to an entirely separate TOS page. Dkt. Nos. 27-13 & 27-14. This is too indirect to constitute clear notice. "The burden is 'on website owners to put users on notice of the terms to which they wish to bind' them,

---

[7] JustAnswer did not specify the time it sent the text message to Foust. Dkt. No. 27 ¶ 45.

1    and not on consumers 'to ferret out hyperlinks to terms and conditions to which they have no

2    reason to suspect they will be bound.'" *Motley*, 2018 WL 5906079, at *2 (quoting *Nguyen*, 763

3    F.3d at 1179). In addition, the California Court of Appeal considered a similar argument by

4    JustAnswer and concluded that it did not provide sufficient notice of the TOS where "the terms are

5    available only if the consumer scrolls through the disclaimers and clicks on a secondary link to the

6    terms of service." *Sellers*, 73 Cal. App. 5th at 483-84. JustAnswer offers no reason why the same

7    result does not follow here.

### F. Cumulative Notice

As a closing point, JustAnswer suggests plaintiffs were on notice of the TOS because they were hyperlinked on multiple web pages, in multiple formats. *See* Dkt. No. 26 at 7 (stressing "the repeated and varied disclosures" of the TOS). In effect, JustAnswer simply lumps together all the prior forms of ostensible notice. The obvious problem is that aggregating individually insufficient forms of notice does not somehow add up to a positive. "Repeated use of a website or mobile application does not contribute to constructive notice because users are no more likely to stumble upon inconspicuous hyperlinks on their hundredth or thousandth visit than they are on their first." *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117, 119-120 (9th Cir. 2020) (unpublished).

## II. ENFORCEABILITY

Pettit says that her claims are not within the scope of the arbitration clause in the TOS. Dkt. No. 31 at 15. But the TOS contain a delegation clause providing that the arbitrator "shall have exclusive authority" to decide "whether a claim is subject to arbitration." Dkt. No. 27-1 at ECF p. 26. "This is just the kind of language which establishes that 'the parties clearly and unmistakably agreed to arbitrate the question of arbitrability.'" *Cornet*, 2023 WL 187498, at *2 (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

Consequently, Pettit may avoid arbitration only if she demonstrated that the delegation clause were itself invalid. This was not done. She suggests that the "delegation provision" is "convoluted" and "unconscionable," but these points are not developed in a meaningful way in her brief. Dkt. No. 31 at 1. The only other mention of the delegation clause is to say that it is not

14

"controlling because … the arbitration agreement, itself, is invalid." *Id*. at 5.  This is a challenge, albeit rather threadbare, to the overall agreement to arbitrate, so it is for the arbitrator to decide. *McLellan*, 2017 WL 4551484, at *1; *see Woody v. Coinbase Glob., Inc.*, No. 23-cv-00190-JD, 2023 WL 6882750, at *3 (N.D. Cal. Oct. 17, 2023).

So too for the claim that the arbitration clause is unconscionable.  Dkt. No. 31 at 16-21. These arguments are addressed to the TOS as a whole, and not the delegation clause, so the arbitrator must resolve them.  *McLellan*, 2017 WL 4551484, at *1.

Pettit's closing objection is that the arbitration clause is unenforceable because "any purported agreement [she] entered into was based upon a misrepresentation and/or omission of material facts regarding the JustAnswer's [sic] payment structure."  Dkt. No. 31 at 14-15.  This argument goes to acceptance of the entire agreement.  *See id.* (plaintiffs "would not have *opened accounts* with JustAnswer" but for the allegedly fraudulent statements) (emphasis added).  The FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)).

## CONCLUSION

Plaintiff Renee Pettit's claims are ordered to arbitration.  Plaintiff Jessica Quamina is dismissed as a plaintiff.  Arbitration, and a stay or dismissal of the case, is otherwise denied.

**IT IS SO ORDERED.**

Dated:  March 5, 2024

JAMES DONATO
United States District Judge