**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KSENIYA GODUN; MOYA MCDOWELL; RENEE PETTIT; KRISTIE NELSON; TASHA DAVIS; LATOYA FOUST, Individually and on behalf of all others similarly situated, | No. 24-2095 <br><br> D.C. No. 3:22-cv-06051-JD |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| JUSTANSWER LLC, | |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the Northern District of California
James Donato, District Judge, Presiding

Argued and Submitted February 10, 2025
Pasadena, California

Filed April 15, 2025

Before: Richard A. Paez, Sandra S. Ikuta, and Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson

# SUMMARY[*]

## Arbitration

The panel affirmed the district court's order denying defendant JustAnswer LLC's motion to compel arbitration in a putative class action under the Electronic Funds Transfer Act and California's and other states' consumer protection laws.

Plaintiffs alleged that they created accounts on justanswer.com and paid to ask questions. Under JustAnswer's Terms of Service, paying for answers to their questions automatically enrolled plaintiffs in a recurring monthly subscription. JustAnswer sought arbitration under a provision in its Terms of Service, asserting that plaintiffs were put on inquiry notice of those terms and agreed to arbitrate any claims arising out of their use of the site when they signed up for its service.

The panel applied California contract law to a "sign-in wrap" agreement, under which a link to the Terms of Service was provided to plaintiffs but they were not required to separately indicate that they had read or agreed with those terms before using justanswer.com's services. Instead, they purportedly manifested agreement by signing up for or continuing to use justanswer.com. The panel concluded that no contracts were formed between plaintiffs and JustAnswer under an inquiry theory of notice, which requires a showing that (1) a website provided reasonably conspicuous notice of the terms to which a consumer will be bound, and (2) the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

consumer took some action, such as clicking a button or checking a box, that unambiguously manifested their assent to those terms. The panel concluded that some plaintiffs were presented with advisals that were insufficiently conspicuous to put them on inquiry notice, and others were not explicitly advised of what actions would be taken to signal assent to contractual terms.

Concurring, Judge R. Nelson wrote that at step one of the inquiry-notice contract formation analysis, the bottom line of the visual-conspicuousness inquiry is reasonableness, but this court's precedent has created confusion, suggesting that something more or something in particular must be looked for. As to the step-two analysis, Judge R. Nelson wrote that this court's precedent has committed to an erroneous doctrinal path by demanding consideration of whether some action taken by the internet user unambiguously manifests their assent to proposed contractual terms, requiring that a website explicitly advise a user that certain acts will be taken to signal that assent.

---

## COUNSEL

Mark R. Sigmon (argued) and Matthew E. Lee, Milberg Coleman Bryson Phillips Grossman PLLC, Raleigh, North Carolina; John Nelson, Milberg Coleman Bryson Phillips Grossman PLLC, San Diego, California; for Plaintiffs-Appellees.

Dominic E. Draye (argued), Robert J. Herrington, and Jessica Kemper, Greenberg Traurig LLP, Los Angeles, California; Michael Burshteyn and Kristin L. O'Carroll, Greenberg Traurig LLP, San Francisco, California; for Defendant-Appellant.

**OPINION**

R. NELSON, Circuit Judge:

This appeal asks whether users of justanswer.com are bound by its Terms of Service. Answering this question requires us to consider whether the users were on inquiry notice of proposed contractual terms and whether we can fairly infer that their use of the site signaled an agreement to contract. We conclude that no meeting of the minds took place and thus affirm the district court.

I

JustAnswer LLC owns and operates justanswer.com, a website that connects users with subject-matter experts. Plaintiffs Tasha Davis, Kristie Nelson, Kseniya Godun, Moya McDowell, Latoya Foust, and Renee Pettit accessed justanswer.com to get answers to their questions. They created accounts and paid between $1–$5 to ask those questions. Under the Terms of Service, paying for answers to those initial questions automatically enrolled them in a recurring monthly subscription that cost between $46–$60 per month.

Plaintiffs brought this putative class action, alleging that JustAnswer violated the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq., and California's and other states' consumer protection laws by enrolling them in the monthly subscription service without their consent and making cancellation difficult. JustAnswer, in turn, moved to compel arbitration, pointing to an arbitration provision in its Terms of Service. JustAnswer asserts that each Plaintiff was put on inquiry notice of those terms and agreed to arbitrate any

claims arising out of their use of the site when they signed up for its service.

A

When Plaintiffs accessed justanswer.com, each was first shown a landing page. Plaintiff Godun would have seen the following landing page:



We do not know what the landing page looked like for the other Plaintiffs. In any case, Plaintiffs—once they typed a question into a text box—were taken to a payment page to

enter their email address and credit card information. Plaintiffs accessed the website at different times and the design of the site changed over time. Because those changes matter, we reproduce the parties' representations of those pages here.

Plaintiff Davis saw the following payment page:



Plaintiff Nelson accessed an updated page that looked like this:



Try 7 days for $5. Then only $46/mo. for expert help until you cancel. Cancel anytime. We'll remind you before trial ends.

By clicking "Start my trial", you agree to the Terms of Service, Privacy Policy, and are over 13 years old.

Plaintiffs Godun, Faust, and McDowell, in turn, each saw similar versions of the payment page. Godun and Faust saw a version that looked like this:



And Plaintiff McDowell's page looked like this:



The blue check-marked box on Plaintiffs Godun, Faust, and McDowell's payment pages was pre-checked, so the parties only needed to click the "Connect now" button to finish the signup process. It is unclear whether they could uncheck the box even if they desired to do so.

Once using JustAnswer's chat interface, Plaintiffs would have encountered an advisal, just beneath the text entry box, stating that "Your conversation is covered by our Disclaimer," where "Disclaimer" was printed in blue and formatted as a hyperlink. And after signing up on justanswer.com, some Plaintiffs received a text message from JustAnswer. Plaintiffs Godun and Faust received a message that read "Welcome to JustAnswer! The Expert will text you here with a response. Text HELP for help and

STOP    to    end.    See    terms    of    service:
www.justanswer.com/info/terms-of-service?r=sms."
Plaintiff McDowell received a similar message.

Some Plaintiffs also received an email after they enrolled
on justanswer.com indicating that they "were charged the
one-time $5 join fee and the $46 membership fee" that
"renews automatically" and "will be charged each month
until you cancel." That email also stated that they could
"[c]ancel anytime," followed by blue hyperlinked text
reading "Learn more."

B

The district court denied JustAnswer's motion to compel
arbitration. It held that Plaintiffs did not receive sufficient
notice of JustAnswer's Terms of Service containing the
arbitration clause.[1] As a result, no contract was formed, and
Plaintiffs could not be compelled to arbitrate.

First, the district court concluded that Plaintiffs Davis
and Nelson were not given sufficiently conspicuous notice
of the purported contractual terms because the payment
pages they saw were "legally indistinguishable from"
versions of the payment page that the California Court of
Appeal dealt with in *Sellers v. JustAnswer LLC*, 73 Cal. App.
5th 444 (2021).

The district court then considered the payment pages
encountered by Plaintiffs Godun, Faust, and McDowell. It
again concluded that the Terms of Service advisals on those
pages were "not reasonably conspicuous because the
hyperlinked terms were only underlined" and "not otherwise

---

[1] The district court granted the motion to compel arbitration as to
Plaintiff Renee Pettit. Pettit did not cross-appeal, however, and so her
claims are not before us.

sufficiently set apart from the rest of the text notice." *Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1038–39 (N.D. Cal. 2024). The district court also emphasized that the text of the advisals on those pages did not "warn[] users that clicking a button would be deemed acceptance of a contract." *Id.* at 1039. That is, rather than explain that users agree to the hyperlinked terms "by clicking" the action button, the advisals on Plaintiffs Godun, Foust, and McDowell's payment pages simply began with the phrase "I agree . . . ."

The district court also concluded that none of the other screens—the landing page that at least Plaintiff Godun saw, the texts, emails, or chat interface disclaimers—satisfied inquiry notice. *Id.* at 1038–40. The court characterized the advisal on the landing page as "the antithesis of conspicuous," *id.* at 1038 (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022)), and determined that the hyperlink was not sufficiently conspicuous, *id.* at 1039–40. The district court further concluded that the texts and email did not create agreement because their contractual nature was not apparent and the Terms of Service were multiple clicks away. *Id.* at 1040.

## II

Because the district court denied JustAnswer's motion to compel arbitration, we have jurisdiction under 9 U.S.C. § 16(a)(1). *See, e.g.*, *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1008 (9th Cir. 2023).

The Federal Arbitration Act requires courts to compel the arbitration of claims covered by an enforceable arbitration agreement. *See* 9 U.S.C. § 3; *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023). "In determining whether the parties have agreed to arbitrate a

particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855 (citing *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

JustAnswer, seeking to compel arbitration, "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). We review de novo a district court's order denying a motion to compel arbitration. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

III

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). "One such principle is the requirement that '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Id.* (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)).

Because contract formation is a question of state law, we first look to the appropriate state law. The parties have represented that there are no material differences in the law of contract formation in California, New York, North Carolina, and Florida (Plaintiffs' states of residence), and that California law should accordingly apply. *See CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1143 (9th Cir. 2010). And we have consistently stated that no differences exist in the law of the different states as to internet contract

formation.**²** *E.g.*, *Nguyen*, 763 F.3d at 1175; *Berman*, 30 F.4th at 855; *Oberstein*, 60 F.4th at 514–15. So we apply California law.

## A

In California, "internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers*, 73 Cal. App. 5th at 463). Here, a link to the Terms of Service was provided to Plaintiffs but they were not required to separately indicate that they had read or agree with those terms before using justanswer.com's services. Instead, they purportedly manifested agreement by signing up for or continuing to use justanswer.com. So we employ the inquiry-notice "sign-in wrap" analytical framework.**³**

---

² This accords with the general practice of other circuits, which generally find state law uniform with respect to internet contract formation. *E.g.*, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 290 n.7 (2d Cir. 2019); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012); *Hancock v. AT&T Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012).

³ Sign-in wrap agreements "include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button." *Sellers*, 73 Cal. App. 5th at 471. Instead, the consumer is "purportedly bound" to the terms of service agreement "by clicking some other button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account." *Id.*

In some cases, however, internet users may need to scroll through contractual terms before using a website or web service (through what's

*See Berman*, 30 F.4th at 865–66 (discussing *Sellers*, 73 Cal. App. 5th at 463–64).

Under an inquiry theory of notice, contracts are formed between website users and operators only where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*, at 856; *accord Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025); *see also Sellers*, 73 Cal. App. 5th at 469; *Herzog v. Superior Ct.*, 101 Cal. App. 5th 1280, 1296 (2024).

1

The first step of the inquiry-notice internet contract formation test asks whether "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound." *Keebaugh*, 100 F.4th at 1018 (quotation omitted); *Herzog*, 101 Cal. App. 5th at 1296. This test has two aspects: the visual design of the webpages and the context of the transaction. Both aspects "should be considered together." *Chabolla*, 129 F.4th at 1155; *see Sellers*, 73 Cal. App. 5th at 477. This means that courts should expect that a reasonable internet user is more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship.

---

called a "scrollwrap" agreement), or they might be asked to affirmatively click a box that does nothing but indicate acceptance of or agreement with terms and conditions (a so-called "clickwrap" agreement). *See Berman*, 30 F.4th at 865–66 (Baker, J., concurring) (quoting *Sellers*, 73 Cal. App. 5th at 463–64).

a

Consider first visual conspicuousness.  For the most part, this is a matter of whether an advisal is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856 (discussing *Specht*, 306 F.3d at 30, and *Nguyen*, 763 F.3d at 1177); *see also Sellers*, 73 Cal. App. 5th at 480–81.  This largely centers on an analysis of the "visual aspects of the notice" within the "overall screen design."  *Keebaugh*, 100 F.4th at 1019; *see Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 865–66 (2016).  This is necessarily a visual and aesthetic analysis.

Under California law, this inquiry is "fact-intensive" and is informed by the "totality of the circumstances." *Oberstein*, 60 F.4th at 514 (quotation omitted).  Following California caselaw, we have discussed certain factors relevant to our visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background). *Long*, 245 Cal. App. 4th at 865–66 ("[T]he Terms of Use hyperlinks—their placement, color, size and other qualities relative to the . . . Web site's overall design—are simply too inconspicuous to meet that standard."); *Oberstein*, 60 F.4th at 516–17; *Berman*, 30 F.4th at 857; *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) (quoting *Nguyen*, 763 F.3d at 1177); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017).

But we have not created a checklist for website designers.  Nor have we generated per se design rules that must be followed for a contract to be formed between a website user and provider.  "[T]here is no bright-line test for finding that a particular design element is adequate in every

circumstance." *Chabolla*, 129 F.4th at 1156–57. And, by the same logic, there are not per se rules about what's necessarily inadequate, either. Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis. Barring changes to state-law doctrines regarding internet contract formation, any suggestion that hard-and-fast rules constrain this inquiry results from over-reading or misreading our precedent.

Importantly—again, at least under California law—"even minor differences" in the design elements may make the difference in this fact-intensive analysis. *Sellers*, 73 Cal. App. 5th at 481. At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user. *See id.* at 471, 483. A hefty dose of common sense goes a long way.

b

Together with the visual prominence of an advisal, we also consider under the first step the "full context of the transaction," *id.* at 477, such as whether the type of transaction "contemplates entering into a continuing, forward-looking relationship" that would be governed by terms and conditions. *Keebaugh*, 100 F.4th at 1017 (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 951 (2022)); *accord Chabolla*, 129 F.4th at 1155–56.

Following California caselaw, we have considered, for example, (1) whether the transaction contemplates a "continuing relationship" by creating an account requiring a "full registration process," *Oberstein*, 60 F.4th at 517 (quoting *Sellers*, 73 Cal. App. 5th at 480); (2) whether the user is entering a "free trial," *id.*; *Blizzard*, 76 Cal. App. 5th at 947; (3) whether a user enters "credit card information,"

*Meyer*, 868 F.3d at 78, 80; and (4) whether the user has downloaded an app on their phone (suggesting consistent accessibility), *Keebaugh*, 100 F.4th at 1020; *cf. Herzog*, 101 Cal. App. 5th at 1303.

2

The second step of the inquiry-notice internet contract formation test asks us to consider whether any action taken by the internet user—such as clicking a button or checking a box—"unambiguously manifest[ed] his or her assent" to proposed contractual terms. *Keebaugh*, 100 F.4th at 1018 (quotation omitted); *see Herzog*, 101 Cal. App. 5th at 1296, 1304–05.

Following California caselaw, we have held that such unambiguous manifestation of assent can only occur in the inquiry-notice context where an internet user is "*explicitly* advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857 (emphasis added); *see also id.* at 858; *cf. Herzog*, 101 Cal. App. 5th at 1305 (quoting same). Even strongly implicit advisement isn't enough—a webpage must *explain* that certain actions will be understood by the offeror to signal assent to contractual terms. *Berman*, 30 F.4th at 857.

And it must identify what, exactly, those actions are. *Berman*, 30 F.4th at 858 ("[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement."); *Keebaugh*, 100 F.4th at 1018; *cf. Herzog*, 101 Cal. App. 5th at 1296 ("[I]t was required to show that the content of its 'Legal' screen supports the inference that the user's action on the screen— here, clicking the checkbox—constituted an unambiguous manifestation of assent to those terms"). *Chabolla*, relying on California law, 129 F.4th at 1154, emphasizes that the

explanation of the legal significance of an action must truly
be unambiguous: there, an advisal read "[b]y signing up you
agree . . . ." *Id.* at 1158. Because the action button read
"Continue," however, rather than "Sign up," the court
concluded that there was no unambiguous manifestation of
assent. *Id.* Explicit advisement generally looks like an
explanatory clause, usually at the beginning of an advisal—
for example: "*By clicking* the Continue >> button, you agree
to the Terms & Conditions," *Berman*, 30 F.4th at 858
(emphasis added and underlining omitted), or "*By tapping*
'Play' I agree to the Terms of Service,"[4] *Keebaugh*, 100
F.4th at 1009, 1020 (emphasis added); *see also Patrick*, 93
F.4th at 474.

B

With these standards in mind, we turn to the screens that
Plaintiffs encountered to consider whether any Plaintiff was
put on inquiry notice that the use of justanswer.com
constituted agreement to the website's Terms of Service.
We conclude that none was. Some Plaintiffs were presented
with advisals that were insufficiently conspicuous to put
them on inquiry notice. Others weren't explicitly advised of
what actions would be taken to signal assent to contractual
terms. Thus, as we conclude below, no Plaintiff agreed to
arbitrate a claim.

---

[4] One can conjure other ways to say this: for example, "Please click
'Continue' to indicate that you agree to our Terms and Conditions."
What matters is the explicit advisement that taking a certain action will
constitute assent to contractual terms. In most cases, we assume that this
will look like a "By clicking . . . " clause.

1

First, consider Plaintiff Davis. The district court correctly determined that the payment page that Plaintiff Davis saw did not put her on notice of any contractual terms. The advisal text is printed in relatively small text and not located "directly above or below" the action ("Start my trial") button. *Oberstein*, 60 F.4th at 516; *see Sellers*, 73 Cal. App. 5th at 479. This creates the impression of being visually "buried." *Berman*, 30 F.4th at 856–57.

Additionally, the color of the advisal text blends into the background and is displayed in a lighter color than other text on the page. *See Sellers*, 73 Cal. App. 5th at 481 ("It also appears in smaller print than any other print on the page and in a grey shade that contrasts with the dark background significantly less than the other text on the page."). In fact, portions of the text are hard to read as they do not contrast with the lighter portions of the background image. *Cf. Oberstein*, 60 F.4th at 518. This gray-on-gray presentation also suggests that the advisal is inconspicuous, and we would not expect a reasonable internet user's attention to be drawn to it. *Cf. Sellers*, 73 Cal. App. 5th at 481; *Berman*, 30 F.4th at 857; *Nguyen*, 763 F.3d at 1178 n.1. While each of these factors may not be enough on their own to support Plaintiff Davis's argument, under the totality of the circumstances, the advisal was not visually conspicuous.

Furthermore, the context of the transaction is informed by the fact that there is an automatically renewing subscription at issue. Under *Sellers*, automatic renewal transactions are those where consumers make a one-time purchase of a product, which triggers an "automatically recurring membership[]" for continued access to the product. *See Sellers*, 73 Cal. App. 5th at 480. For such transactions,

it must be clear that consumers agree not only to the one-time purchase, but also to the continuing purchases going forward. *Id.* at 458. In fact, *Sellers* considered not only this *sort* of transaction, but a near-identical transaction involving the same website and subscription.[5]  *See id.* at 482.

### 2

As for Plaintiff Nelson, the issue of gray-on-gray text has been cured and, unlike the page that Plaintiff Davis saw, the advisal text is the same color as other text on the page. *Cf. id.* at 479. The advisal is not, however, located directly above or below the action button and is displayed in relatively small text. *Oberstein*, 60 F.4th at 516; *cf. Berman*, 30 F.4th at 856–57. Considering the notice in the full context of the transaction, we would not expect a reasonably prudent internet user to be on inquiry notice of the contract.

### 3

Finally, we consider Plaintiffs Godun, Faust, and McDowell. Looking at the payment pages that these Plaintiffs saw, we need not consider step-one reasonable conspicuousness. The advisal on these pages failed to explicitly advise users of what action would constitute assent to any terms they were provided with. *See Berman*, 30 F.4th at 858. "The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense,'" and "[i]f there is no evidence establishing a manifestation of assent to the 'same thing' by both parties,

---

[5] As discussed above, the context-of-the-transaction considerations for each of the pages that Plaintiffs saw dovetail with this one and, in turn, with *Sellers*. While justanswer.com's webpage design evolved, the nature and context of the transaction remained, in material respects, fixed for the purposes of our analysis. Accordingly, we don't repeat our discussion of the context of the transaction below.

then there is no mutual consent to contract and no contract
formation." *Sellers*, 73 Cal. App. 5th at 460 (quotations
omitted).

The advisal lacked an explanatory phrase indicating that
"By clicking connect now" or "By connecting," or "By
chatting," etc., she agreed to the terms.[6] Like the faulty
advisals in *Berman* and *Chabolla*, it instead simply said "I
agree" without explaining more. *See id.*; *Chabolla*, 129
F.4th at 1158. Under our precedent construing California
law, that is not enough to constitute "an unambiguous
manifestation of assent" to those terms. *Sellers*, 73 Cal. App.
5th at 459; *Berman*, 30 F.4th at 857. And JustAnswer's
proposed routes around *Berman* and that ambiguity are
unavailing.

JustAnswer first suggests that *Berman* was not
sufficiently clear on this point, or that no such rule demands
explicit advisement. While *Berman* was straightforward, we
clear up any remaining confusion: an advisal that simply
states that "I understand and agree to the Terms and
Conditions" but fails to "indicate to the user what action
would constitute assent" is not enough to invite an
unambiguous manifestation of assent. *See Berman*, 30 F.4th
at 858; *cf. Herzog*, 101 Cal. App. 5th at 1304.

Second, JustAnswer argues that "the full context of the
transaction" should overcome the lack of an explanatory "By

---

[6] If Plaintiffs were asked to affirmatively check or click the pre-checked
box, however, we may reach a different result. Asking users to "click[]
on an 'I accept' or 'I agree' button" would have created a "clickwrap"
agreement, and thus would have been presumptively enforceable.
*Blizzard*, 76 Cal. App. 5th at 944–45; *accord Oberstein*, 60 F.4th at 513;
*Berman*, 30 F.4th at 856; *see also Herzog*, 101 Cal. App. 5th at 1296–
97.

clicking . . . " clause. *Cf. Chabolla*, 129 F.4th at 1171–72 (Bybee, J., dissenting).  But that argument misunderstands the nature of the test and crosses doctrinal wires.  The context of the transaction is relevant at step one of the inquiry-notice online contract formation test, not step two.  Again, step one asks whether "the website provides *reasonably* conspicuous notice of the terms to which the consumer will be bound," *Keebaugh*, 100 F.4th at 1018 (quotation omitted and emphasis added), considering both visual conspicuousness and the context of the transaction in totality, *see Chabolla*, 129 F.4th at 1155–56.  Step two asks a different question:  whether there is an *unambiguous* manifestation of assent.  *Berman*, 30 F.4th at 857; *see Herzog*, 101 Cal. App. 5th at 1297–1305.  Step two does not look to the context of the transaction but relies on the explicit advisement of what actions will be taken to signify assent.

Relatedly, the parties trade volleys about whether the naked text overlaying an action button can (or should) be dispositive.  Under *Chabolla*, the text on an action button matters insofar as it matches an advisal's explanation.  *See* 129 F.4th at 1158–59; *see also Berman*, 30 F.4th at 858.  But nothing about the text on an action button by itself can overcome the rule, in the inquiry-notice or "sign-in wrap" context, mandating explicit advisement in advisal language so that there is unambiguous manifestation of assent.

Accordingly, even if Plaintiffs saw these advisals, there was no meeting of the minds under our precedent, and the payment pages that Plaintiffs Godun, Faust, and McDowell saw fail at step two.

And the landing page that Plaintiff Godun saw was insufficient at step one to put her on inquiry notice of JustAnswer's proposed contractual terms.  The advisal is

displayed in small text. *See Berman*, 30 F.4th at 856–57. Although the white text stands out against a black background and is close to the action ("Start chat") button, *cf. Oberstein*, 60 F.4th at 518, the black background is outside the main frame of the screen, *see Sellers*, 73 Cal. App. 5th at 481. Placing the notice on the black border (coupled with an "x" button apparently permitting the user to close a dialogue box) creates the visual impression of being "tucked away" or not important to the transaction. *See Wilson*, 944 F.3d at 1221 (quotation omitted). While the page is generally uncluttered, the placement of the advisal on the black border creates an impression of visual discontinuity. This does not "capture the user's attention" and direct her to the notice. *Berman*, 30 F.4th at 857 (quoting *Nguyen*, 763 F.3d at 1178 n.1).[7]

## IV

Plaintiffs were not on inquiry notice of JustAnswer's proposed contractual terms. So no contract was formed, and Plaintiffs never agreed to arbitrate their claims.

**AFFIRMED.**

---

[7] None of the screens or messages Plaintiffs saw after signing up put them on inquiry notice of contractual terms, either. As the district court noted, these messages were not temporally coupled with the relevant transaction (signing up for the trial), and none was obviously contractual. *See Sellers*, 73 Cal. App. 5th at 482–83. Likewise, while the chat interface that Plaintiffs saw linked to a disclaimer, the Terms of Service could be accessed only through a second link. *See id.* at 483–84.

R. NELSON, Circuit Judge, concurring:

Under our precedent, JustAnswer's motion to compel arbitration was properly denied. I write separately to address two aspects of our precedent that warrant more attention.

I

As to step one of the inquiry-notice internet contract formation analysis, the bottom line of the visual-conspicuousness inquiry is reasonableness. *E.g.*, *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513–14 (9th Cir. 2023). But our precedent has created confusion, suggesting that we look for something more—or something in particular.

Consider our past statements on hyperlinks. While we have acknowledged that the Platonic ideal of the hyperlink is blue and underlined, *id.* at 516, that does not mean that a reasonably prudent internet user recognizes a hyperlink only when it's formatted that way or when it's a different color than the surrounding text.

After all, a hyperlink can also be signaled "by the use of symbols or other marks" that set the term apart from other design elements. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018). Again, what matters is the use of "[c]ustomary design elements denoting the existence of a hyperlink." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1021 (9th Cir. 2024) (quotation omitted).

Accordingly, our observation that "[s]imply underscoring words or phrases . . . will often be insufficient" to signal a hyperlink is problematic. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). This is neither true as a matter of practice (i.e., as a statement of

what's truly customary), nor does it accord with how courts have recognized the internet has worked since its inception. *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 852 (1997) ("Typically . . . links are *either* blue *or* underlined text—sometimes images." (emphasis added)).

There's no checklist, magic recipe, or set of per se rules to consult. The district court seemed to assume such a per se rule as it reviewed the screens that Plaintiffs Godun, Faust, and McDowell saw, and it was wrong to do so. *See Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1039 (N.D. Cal. 2024). While the majority didn't need to reach that issue, I would conclude that the payment pages that Godun, Faust, and McDowell saw satisfied the step-one visual-conspicuousness inquiry. After all, if an internet user did not recognize that this underlined text is a hyperlink, she is not reasonably prudent:

 I agree to the Terms of Service, Privacy Policy, and am 13+ years old. I understand this membership renews automatically and will continue until I cancel. I can cancel anytime. Prior charges will not be refunded.

In interpreting our authorities, district courts, future panels, and practitioners should take care not to allow dicta in our precedents—including *Berman*—to be interpreted to freeze the internet in judicial amber. Instead, they should ask how a reasonably prudent internet user would navigate the page considering the totality of the circumstances.[1]

---

[1] A brief comment on the second element of the first step: the context of the transaction. Here, some California caselaw is somewhat hard to parse and has strange implications. *Sellers* addressed a particular California statute—the Automatic Renewal Law (ARL), Cal. Bus. &

Of course, reference to past cases can help calibrate judges' instincts and ensure some modicum of consistency. Otherwise, we run the risk of "destabiliz[ing] law and business" by sowing unpredictability. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1172 (9th Cir. 2025) (Bybee, J., dissenting).   But courts should look for reasonable conspicuousness.   Nothing more.   Avoiding judge-made per se rules and being cautious not to subject inquiry-notice internet contracts to "the strictest scrutiny" ensures sensical results. *See id.*

II

As to the step-two analysis, we have committed to an erroneous doctrinal path. There, our precedent demands that we consider whether some action taken by the internet user unambiguously manifests her assent to proposed contractual terms, requiring that a website *explicitly* advise a user that certain acts will be taken to signal that assent. *Berman*, 30 F.4th at 857.  That holding drove portions of the majority decision. *See Maj.* at 20-22.

---

Prof. Code § 17600 et seq.—in its context-of-the-transaction analysis. *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477–80 (2021). It assumes throughout that the substantive ARL law can and should inform or affect consumers' expectations regarding the context of an internet transaction. This makes little sense—if any. After all, the question of contract formation is antecedent to (and analytically independent of) substantive claims.   What's more, *Sellers* appears to have applied a "clear and conspicuous" notice requirement—borrowed from California's ARL statute—rather than a "reasonably conspicuous notice" standard. *See Keebaugh*, 100 F.4th at 1020 n.5. So California courts may well want to revisit *Sellers*, which is probably confused as a matter of first principles and certainly confusing as a matter of application.

Here, we demand magic words—or, at least, we come very close.[2] *Contra Chabolla*, 129 F.4th at 1171–72 (Bybee, J., dissenting). While this has the benefit of a bright-line rule, it is inconsistent with historical and traditional contract law. And the fact that we have deviated from traditional blackletter law is a problem because we simultaneously instruct courts to do the opposite: "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quotation omitted); *see also Chabolla*, 129 F.4th at 1154 ("Online contracts are subject to the same elemental principles of contract formation as paper contracts.").

In state contract law—including in the states that Plaintiffs hail from—assent does not hinge on explicit advisement. Instead, it is controlled by objective manifestations of assent, where parties' words and acts are given their "reasonable meaning." *Eagle Fire & Water Restoration, Inc. v. City of Dinuba*, 102 Cal. App. 5th 448, 468 (2024) (citing *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 460 (2021)). This means that an offeree's assent may be reasonably or "fairly . . . inferred." *Sivin-Tobin Assocs., LLC v. Akin Gump Strauss Hauer & Feld LLP*, 892 N.Y.S. 2d 71, 73 (N.Y. App. Div. 2009) (quotation omitted); *see also Schwarz v. St. Jude Med., Inc.*, 254 N.C. App. 747, 756 (2017).

Traditionally, then, "[t]he phrase 'manifestation of intention' adopts an external or objective standard for interpreting conduct . . . . A promisor manifests an intention

---

[2] As the majority notes, there are other ways one might imagine phrasing such an explicit advisement. *See Maj.* at 18 n.4. So it is not quite so talismanic as demanding the exact words "By" and "clicking."

if he believes or has reason to believe that the promisee will infer that intention from his words or conduct." Restatement (Second) of Contracts § 2 cmt. b (1981). "As long as the conduct of a party is volitional and that party knows or *reasonably ought to know* that the other party *might reasonably infer from the conduct an assent to contract*, such conduct will amount to a manifestation of assent." 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 4:2 (4th ed. May 2024 Update) (emphasis added). Nothing must be spelled out, and nobody needs to be explicitly advised of anything. There are, in the world of paper contracts, no magic words necessary.

So we can say that we are considering a reasonable-inference standard in contract formation. *See Chabolla*, 129 F.4th at 1154. But when we turn around and demand that a website provider "explicitly advise[]" internet users what actions will be taken to signal assent, *Berman*, 30 F.4th at 857, we do something else. And that doctrinal blurring is prone to, in turn, bleed into state law as states strive to create consistency by following our rococo rules. *E.g.*, *Herzog v. Superior Ct.*, 101 Cal. App. 5th 1280, 1296 (2024).

The Second Circuit has avoided this pitfall and correctly suggested that California law (and the law of other states) wouldn't demand these magic words. *See Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702–04 (2d Cir. 2023). Keeping with traditional principles of contract law, the Second Circuit held that "acceptance need not be express," and can be manifested by "evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." *Id.* (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 128 (2d Cir. 2012)). Accordingly, the Second Circuit has held that an advisal beginning with "I

agree . . ." and lacking any "By clicking . . ." explanatory
clause satisfies the step-two inquiry for a comparable sign-
in wrap agreement context—even under California law.  *Id.*
at 702–03, 707.

Under this more sensical approach, we would open the
inquiry to look at more than the mere presence of an
explanatory phrase.  We would instead take the approach
advocated for by Judge Bybee in his dissent in *Chabolla*, 129
F.4th at 1171–72 (Bybee, J., dissenting):  consider what's
reasonable in context.  If we were writing on a blank slate,
historical and traditional principles of contract law—and
California contract law itself—would demand this approach.

We got it wrong, the Second Circuit got it right, and we
should pivot to follow its lead by revisiting *Berman*'s
explicit advisement rule.  In cases like this one, our decision
should be driven only by state law, which generally looks to
the "reasonable meaning of [parties'] words and acts,"
*Sellers*, 73 Cal. App. 5th at 460, to find assent, rather than
our own invented standard that demands more.  Or, at the
very least, we should be careful not to transpose that rule
outside of California law.

Litigants, too, should be careful to observe state-law
formation rules, including any differences between the
states.   This might mean, for example, doing more to
accentuate the differences between the states to stymie any
potential spread of an ahistorical explicit advisement rule.
Where, as here, when parties don't carry this burden,
however, we generally must "default to forum" law—here,
the law of California.  *CRS Recovery, Inc. v. Laxton*, 600
F.3d 1138, 1143 (9th Cir. 2010).  This can flatten potential
distinctions between state law in contract formation,
including on the critical question of the manifestation of

assent.  Greater burden-shouldering by litigants, however, is
necessary to police doctrinal distinctions and hew to contract
law's history and tradition.